IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC VON POOLE,           *

    Plaintiff,         *

v.                        *     Civil Action No. GLR-17-1594

NBCI, et al.,             *

    Defendants.        *

*****
**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc. ("Wexford"), Mahboob Ashraf, M.D., William Beeman, R.N., and Ryan Browning, L.P.N.'s[1] (collectively, "Medical Defendants") Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 21) and Plaintiff Eric Von Poole's Motion for Injunctive Relief (ECF No. 32).[2] The Motions are ripe for disposition, and no

---

[1] The Court will direct the Clerk to amend the docket to reflect Nurse Ryan's proper name.

[2] Also pending before the Court is Poole's Motion for Clerk to Send Copy of Plaintiff's Response to Defendants (ECF No. 24). In his Motion, Poole requests that the Clerk send a copy of his Opposition to Medical Defendants' counsel. Under Local Rule 112.2(c) (D.Md. 2018), self-represented prisoner litigants need not serve pleadings on opposing counsel by mail, and Medical Defendants received an electronic copy when Poole's Opposition was filed with the Court. Accordingly, the Court will deny this Motion as moot.

Two additional motions are pending but are not before the Court at this time. First, pending but unripe is a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 36) from other Defendants in this case, all of whom are Department of Public Safety and Correctional Services ("DPSCS") employees. The only Defendant who did not join in this Motion is Scott Steininger, Correctional Dietary Manager. Second, pending and ripe is Poole's Motion for Temporary Restraining Order, Reconsideration [of]

hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons that follow, the Court will grant Medical Defendants' Motion and deny Poole's Motion.

## I. BACKGROUND[3]

Poole, an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, had his right hip replaced at the University of Maryland Medical System ("UMMS") on June 19, 2007. (Compl. at 1, ECF No. 1; Pl.'s Opp'n at 2, ECF No. 23).[4] On January 16, 2017, Krista Bilak, CRNP, saw Poole for a chronic care appointment. (Compl. ¶ 7). Bilak informed him of the results of a report from orthopedic consultation he had at UMMS. (Id.). The report, dated December 29, 2016 and prepared by Roy J. Carls, M.D., indicates that Poole underwent several hip surgeries in his youth, which eventually necessitated a total hip replacement. (Defs.' Mot. Ex. 1 at 1, ECF No. 16-4).[5] It notes that the condition of Poole's right hip replacement was worsening, and it recommends that

---

Appoint[ment] of Counsel and Order Granting the Plaintiff's Request and Additional Exhibits (ECF No. 38), which the Court will address at a later date.

[3] Unless otherwise noted, the facts outlined here are set forth in Poole's Complaint (ECF No. 1) and Amended Complaint and Supplement (the "Supplement") (ECF No. 4). To the extent the Court discusses facts that Poole does not allege in his Complaint and Supplement, they are uncontroverted and the Court views them in the light most favorable to Poole. The Court will address additional facts when discussing applicable law.

The Court discusses only Poole's allegations against Medical Defendants. The remainder of the allegations in the Complaint and Supplement concern Poole's assertions that DPSCS employees have denied him opportunities to practice his chosen religion and have retaliated against him.

[4] Citations to the Complaint refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

[5] Citations to Exhibit 1 to Medical Defendants' Motion refer to the pagination CM/ECF assigned.

Poole see the UMMS orthopedists who performed his hip replacement surgery. (Id.; Compl. ¶ 7).

On March 22, 2017, Dr. Theodore Manson at UMMS saw Poole. (Compl. ¶ 15; Defs.' Mot. Ex. 1 at 2–5). Dr. Manson recommended that Poole participate in twelve weeks of physical therapy, three times per week, and that Poole receive a bone scan. (Compl. ¶ 15; Defs.' Mot. Ex. 1 at 2–5).[6] The physical therapy was to include edema management, active and passive range of motion, assisted range of motion, resistance strengthening exercise, stretching, gait training, development of home exercise program, electrical stimulation, and ultrasound. (Defs.' Mot. Ex. 1 at 4–5). Dr. Manson recommended a follow-up appointment after the bone scan was performed. (Id. at 2). Despite these recommendations, Poole states that "the facility chose to again disregard the [o]rder" and, as a result, he filed an Administrative Remedy Procedure ("ARP") (NBCI 0778-17) on April 20, 2017. (Compl. ¶ 15).

Also on April 20, 2017, Poole began physical therapy at NBCI with Physical Therapist Stephen D. Ryan. (Defs.' Mot. Ex. 1 at 8). Ryan measured Poole's range of motion, observed his gait as within functional limits, and noted that his surgical incision was well-healed, with no tenderness, swelling, or bruising to the area. (Id.). Ryan noted that Poole exhibited "marked reactivity" during some of the assessment and questioned if

---

[6] Poole interprets Dr. Manson's recommendation as prescribing physical therapy "at UMMS Rehabilitative Department." (Compl. ¶ 15). It is not clear from Dr. Manson's recommendation, however, whether he intended to prescribe the physical therapy to be completed at NBCI or at the UMMS Rehabilitative Department. In any event, the difference in where Poole was to receive his physical therapy is not a material factual dispute.

3

this was possibly "symptom magnification." (Id.). Poole had another physical therapy session with Physical Therapist Assistant Lloyd Hott on April 25, 2017. (Id. at 9).

On April 27, 2017, Hott saw Poole. (Id. at 10). Poole reported his hip pain was a ten out of ten on the pain scale. (Id.). At this appointment, Poole performed isometric hip exercises and he was provided electrical stimulation and ultra sound. (Id.).

When Poole saw Hott again on May 2, 2017, he continued to rate his pain as a ten out of ten, but Hott noted that Poole walked to therapy. (Id. at 14). At this appointment, Poole also said he was not going to tell Hott anything anymore because he had read the notes from previous physical therapy visits and saw that Hott documented what Poole had said. (Id.). After Poole performed the exercises provided as he could tolerate, he was given electrical stimulation and ultra sound. (Id.).

On May 11, 2017, Hott again provided physical therapy to Poole. (Id. at 16). Poole reported at this appointment that the pain in his right hip had increased since the last time he was seen and described it as "throbbing in his thigh." (Id.). Poole performed the prescribed physical therapy exercises and was provided a heat pack and electrical stimulation at this appointment. (Id. at 16–17).

On May 18, 2017, Ryan re-evaluated Poole. (Id. at 18). Poole told Ryan his symptoms had not improved, but Poole exhibited some improvement in function during the evaluation. (Id.). Ryan recommended six more physical therapy sessions. (Id.). The goal of those additional sessions was to increase the strength in Poole's right hip, improve flexibility, and to develop a self-management program. (Id.).

The next day, Poole had a physical therapy session with Hott. (Id. at 19). Poole had additional physical therapy sessions with Hott on May 20 and 23, 2017; June 13, 15, and 27, 2017. (Id. at 20–27). Ryan saw Poole on June 29, 2017 for recertification of the order for physical therapy sessions, and Poole reported some improvement in his symptoms. (Id. at 28). Ryan noted that Poole was at the "optimum level of functional mobility" and that the "optimum benefit from PT [had been] obtained." (Id.). Poole's treatment plan was to complete the current course of physical therapy and establish a self-management program. (Id.).

On July 3, 2017, when Poole went to physical therapy with Hott, he complained that he was in a lot of pain because of the evaluation he had with Ryan the previous week. (Id. at 29). The session did not include exercises because Poole said he was in too much pain to do them. (Id.). Two days later, Poole gave a similar report. (Id. at 30). Hott noted that he felt Poole could benefit from the use of some exercise machines to strengthen and stabilize his hip without adding impact. (Id.). Hott's plan was to speak with Ryan about that possibility. (Id.). On July 7, 2017, Poole again reported that he was in too much pain to participate in physical therapy. (Id. at 31). One week later, Krista Self, RNP, added a prescription for Tramadol, a narcotic pain-reliever, to Poole's medications. (Id. at 35).

On July 24, 2017, Poole saw Dr. Ava Joubert-Curtis for his chronic hip pain and hypertension. (Id. at 36). Dr. Joubert-Curtis reported that Poole described his "biggest problem" as having no access to exercise equipment which he blamed for his fifty-pound weight gain over the past year. (Id.). She also expressed that Poole was evasive in his responses to questions about whether he was taking the medication prescribed to him for

5

his pain, in particular Mobic, an anti-inflammatory medication. (Id.). Despite his complaints, Poole told Dr. Joubert-Curtis that he was able to walk for forty minutes, five-times per week. (Id.). Dr. Joubert-Curtis urged Poole to take his medications and, after explaining the expected benefits of weight-loss including better pain control, noted that he expressed no problems with going on a 1,500 calorie per-day diet to lose the weight. (Id. at 37).

On August 14, 2017, when Dr. Joubert-Curtis saw Poole again, he had no notable weight-loss and his blood pressure remained elevated. (Id. at 39). Poole told Dr. Joubert-Curtis that he had filed an ARP because nothing offered at NBCI had adequately addressed his hip pain. (Id.). After reviewing Dr. Carls' report from 2016, Dr. Joubert-Curtis ordered a consultation for a bone scan. (Id. at 39–40). That consultation request was subsequently approved. (Ashraf Aff. ¶ 8, ECF No. 16-5).

At a mediation regarding the ARP, Poole met with Nurse Browning, where Poole explained the need for his physical therapy at the UMMS location because the facility at NBCI was "in a room the size of a closet with no equipment that could properly rehabilitate [his] injury." (Compl. ¶ 15). Poole states that he contacted the "parent company" of Wexford explaining he had "been doing non-stren[uous] exercises" with "PT assistant Lloyd Hott" which were not helping with his pain. (Id.). He further alleges Hott told him that he "need[ed] not only the [use] of the equipment and resources of UMMS," but that he "would also need to continue the rehabilitative therapy on a daily basis." (Id.). Poole states Hott acknowledged that NBCI did not have the necessary equipment as it was discontinued in 2012. (Id.).

On June 9, 2017, Poole filed his Complaint against multiple Defendants, including Medical Defendants, under 42 U.S.C. § 1983 (2018). (ECF No. 1). On June 15, 2017, Poole filed an Amended and Supplemental Complaint (the "Supplement").[7] (ECF No. 4). Poole alleges that Medical Defendants: (1) exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the U.S. Constitution; and (2) violated his due process rights under the Fourteenth Amendment to the U.S. Constitution when they deprived him of "any exercise compatible with" what the UMMS doctor recommended. (Suppl. ¶¶ 25, 28).

On October 10, 2017, Medical Defendants filed their first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 16). The Court denied this Motion without prejudice on August 21, 2018, to correct clerical errors in this case. (Aug. 21, 2018 Order, ECF No. 19). On August 22, 2018, Medical Defendants filed their Renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 21). Poole filed his Opposition on September 13, 2018. (ECF No. 23). To date, the Court has no record that Medical Defendants filed a Reply.

Poole filed his Motion for Injunctive Relief on December 17, 2018. (ECF No. 32). To date, the Court has no record that any of Defendants filed an Opposition.

---

[7] Although an amended complaint typically supersedes the original complaint, Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014) aff'd, 610 F.App'x 341 (4th Cir. 2015), because Poole states in his Supplement that he "seek[s] to incorporate" the pleading, the Court construes the Complaint and Supplement together as the operative complaint, Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)) ("Pro se pleadings, however, are liberally construed and held to a less stringent standard than pleadings drafted by lawyers."); accord Brown v. N.C. Dep't of Corr., 612 F.3d 720, 722 (4th Cir. 2010).

7

## II. DISCUSSION

### A. Medical Defendants' Motion

#### 1. Conversion of Medical Defendants' Motion

Medical Defendants style their Motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (quoting Young v. UPS, No. DKC-08-2586, 2011 WL 665321, at *20 (D.Md. Feb. 14, 2011). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit.'" Harrods, 302 F.3d at 244 (quoting Evans, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Evans, 80 F.3d at 961). Nevertheless, the Fourth Circuit has indicated that there are some limited instances in which summary judgment may be premature notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. See id. A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[] as the functional equivalent of an affidavit." Id. at 245 (quoting First Chicago Int'l v. United Exch. Co., 836 F.2d 1375, 1380–81 (D.C.Cir. 1988)).

Here, Poole was on notice that the Court might resolve Medical Defendants' Motion under Rule 56 because they styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. Poole does not request additional time for discovery and he presents extra-pleading materials for the Court to consider with his Opposition. Because the Court considers the parties' extra-pleading materials in resolving Medical Defendants' Motion, the Court construes their Motion as a motion for summary judgment.

## 2. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

3. **Analysis**

Medical Defendants advance two principal arguments: (1) that the Complaint and Supplement fail to adequately state a claim against them as Poole does not clearly articulate any alleged wrong-doing or harm they caused; and (2) there is no evidence that Medical Defendants were deliberately indifferent to Poole's medical needs or that any of them provided Poole with medical care, and therefore they are entitled to judgment as a matter of law.[8] Poole, for his part, asserts that he "disputes the declarations by all of the medical

---

[8] Medical Defendants also maintain that (1) Wexford cannot be held liable on a respondeat superior theory of liability; (2) Poole does not allege sufficient facts to support a punitive damages claim; and (3) Poole is not entitled to injunctive relief. Because the Court will conclude that Medical Defendants are entitled to judgment as a matter of law on Poole's constitutional claims, the Court does not address these arguments.

12

defendants regarding the deliberate indifference that the [M]edical [D]efendants caused." (Pl.'s Opp'n at 6–7). In support of his argument, Poole cites the fifty-seven exhibits to his Complaint, which establish that they disregarded Dr. Manson's recommendations, as evidence of their deliberate indifference. The Court agrees with Defendants second argument.

### i. Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695–96 (4th Cir. 1999).

To establish an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate that: (1) objectively, he was suffering from a serious medical need; and (2) subjectively, the defendants were aware of his need for medical attention but failed to either provide it or ensure that it was available. See Farmer v. Brennan, 511 U.S. 825, 834–7 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017).

13

The medical condition at issue must be serious. See Farmer, 511 U.S. at 837. A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (concluding that the failure to provide a diabetic inmate with insulin where physician acknowledged it was required is evidence of was an objectively serious medical need).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. See Farmer, 511 U.S. at 839, 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844.

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2001) (citing Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998)) (noting that the focus must be on precautions actually taken in light of suicide risk, not those that could have been taken); see also Jackson v. Lightsley, 775 F.3d 170, 179 (4th Cir. 2014) (physician's act of

prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)). Neither party disputes the seriousness of Poole's medical problems with his right hip. Accordingly, the Court confines its analysis to the subjective component of the deliberate indifference inquiry.

Poole alleges that Medical Defendants violated his Eighth Amendment rights when they: (1) failed to follow Dr. Manson's recommendation that Poole receive physical therapy at the UMMS Rehabilitation Department, leading to an exacerbation of his pain; and (2) failed to inform DPSCS of Dr. Manson's recommendation, which resulted in his continued assignment to a prison where the proper equipment for physical therapy was not available. (Suppl. ¶¶ 22, 25).

With regard to the first alleged constitutional violation, Dr. Manson recommended twelve weeks of physical therapy three times a week on March 22, 2017.[9] The evidence in

---

[9] Dr. Mason also recommended a bone scan. (Defs.' Mot. at 1). Although a request for a bone scan was submitted, that request was denied in favor of referring Poole to physical therapy first, (see Pl.'s Opp'n Ex. 1 at 24, ECF No. 38-1), and a bone scan was ultimately approved after Poole completed his physical therapy sessions, (Ashraf Aff. ¶ 8).

15

the record indicates that although Poole did not receive the physical therapy at UMMS, the recommendation that Poole receive physical therapy, including exercises, electrical stimulation, and ultrasound was followed. The physical therapy evaluations he received at NBCI document improvement in the functionality of his hip and in the pain he was experiencing. When Poole complained of his hip pain, Nurse Self and Dr. Joubert-Davis prescribed him medications to help manage it. Thus, the evidence in the record reflects that Poole received regular medical treatment and physical therapy sessions for his hip. The fact that Poole did not receive his physical therapy sessions at the UMMS Rehabilitation Department does not establish Medical Defendants' deliberate indifference. Clawson, 650 F.3d at 538 (quoting Bowring, 551 F.2d at 47–48). Further, Poole does not allege or produce evidence that Medical Defendants made or were otherwise responsible for the decision to provide Poole physical therapy at NBCI instead of at UMMS. Thus, even if the failure to permit Poole to receive physical therapy at UMMS constituted a constitutional violations, neither Poole's allegations nor the evidence in the record implicate Medical Defendants.

Poole's second assertion is that he was not provided with the proper exercise equipment for use in his physical therapy sessions. He surmises what is proper equipment for rehabilitation from what he was provided during his stay at Jessup Correctional Institution ("JCI") and during his rehabilitation program at UMMS following his hip replacement surgery. (Pl.'s Opp'n at 2). Even if the equipment at JCI and UMMS were the

---

Poole does not take issue with the delay in receiving a bone scan; his allegations focus only on the failure to send him to UMMS for physical therapy.

proper equipment, the failure to provide such equipment does not rise to a constitutional claim because they were not a medical necessity. Clawson, 650 F.3d at 538 (quoting Bowring, 551 F.2d at 47–48). As discussed above, Poole received physical therapy, including exercises and treatment modalities Dr. Manson recommended, and the functionality of Poole's hip and his pain improved. The fact that Poole desires different or additional equipment for physical therapy does not constitute a constitutional violation. Id. (quoting Bowring, 551 F.2d at 47–48). Further, similar to the first alleged Eighth Amendment violation, Poole does not allege or establish that any of Medical Defendants were involved in decisions about the physical therapy equipment at NBCI generally, or the equipment that was available to Poole in particular.

In sum, while this Court does not doubt that Poole was in pain, there is no evidence in the record that Medical Defendants took no action to treat his condition, or that the actions taken were not reasonable. To the extent Poole was not provided with the precise type of physical therapy that was initially recommended, the failure to provide it does not rise to a constitutional violation absent extraordinary circumstances. Poole does not allege or establish extraordinary circumstances, and therefore, his disagreement with the course of care does not constitute a constitutional violation.

Thus, the Court concludes that Poole's Eighth Amendment claims fail as a matter of law. Accordingly, the Court will grant Medical Defendants' Motion as to Poole's Eighth Amendment claims.

### ii. Fourteenth Amendment Due Process Claim

Poole alleges that Medical Defendants violated his due process rights under the Fourteenth Amendment when they deprived him of "any exercise compatible with" what the UMMS doctor recommended.[10] (Suppl. ¶¶ 25, 28). Medical Defendants contend that this allegation fails to state a claim and that Poole received necessary and appropriate medical treatment to address the issues with his right hip. The Court agrees that Poole fails to state a claim.

In general, prisoners retain certain rights under the Due Process Clause of the U.S. Constitution. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." Meachum v. Fano,

---

[10] In his Opposition, Poole alleges for the first time that Medical Defendants "violated the regulations that require them to adhere to the medical contract that was approved by the [Maryland] state government." (Pl.'s Opp'n at 10). Poole may not amend his Complaint and Supplement through his briefs. Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) aff'd, 141 F.3d 1162 (4th Cir. 1998) ("[Plaintiff] is 'bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."). Accordingly, the Court does not consider this allegation.

Further, assuming this allegation is true and is properly before the Court, it still fails. "[T]he adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process." Kitchen v. Ickes, 116 F.Supp.3d 613, 629 (D.Md. 2015) (citing Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987)), aff'd, 644 F.App'x 243 (4th Cir. 2016); see also Riccio v. County of Fairfax, 907 F.2d 1459, 1466 (4th Cir. 1990) (noting "a state does not necessarily violate the Constitution every time it violates one of its rules"). Thus, Medical Defendants' purported failure to adhere to a contract does not constitute a due process violation, and Poole does not allege an independent violation of his constitutional rights arising out of Medical Defendants' alleged failure to follow the contract.

427 U.S. 215, 224 (1976). Liberty interests protected by due process generally extend only to those conditions that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).

Here, Poole does not allege or establish that he has a protected liberty interest in being able to perform exercises compatible with Dr. Manson's recommendations, nor could he. Not being able to perform certain physical therapy exercises does not impose an "atypical and significant hardship" on him. Id.; cf. Burrell v. Sowers, No. PJM-09-1038, 2012 WL 628506, at *13 (D.Md. Feb. 24, 2012) (collecting cases) ("Prisoners . . . do not have a constitutionally protected right . . . to access education or rehabilitative programs.").

Thus, the Court concludes that Poole's due process claim fails as a matter of law. Accordingly, the Court will grant Medical Defendants' Motion as to Poole's due process claims.

**B.     Poole's Motion**

In his Motion for Injunctive Relief, Poole seeks an order requiring: (1) a visit to the UMMS Rehabilitation Department; (2) "relief from pain"; and (3) the Department of Corrections to stop the "shunning and retaliatory actions during [the] original ARP complaint." (Mot. Inj. Relief at 4, ECF No. 32).

A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. See,

e.g., Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). With regard to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)). In the prison context, courts should grant preliminary injunctive relief that involves the management of correctional institutions only under exceptional and compelling circumstances. See Taylor v. Freeman, 34 F.3d 266, 269–70 (4th Cir. 1994).

In this case, Poole does not address or provide any information about the factors used to consider whether injunctive relief is warranted. Nor does he provide any facts regarding the alleged retaliation or even specify the ARP that initiated it. Further, because the Court will grant Medical Defendants' Motion, Poole cannot demonstrate a likelihood of success on the merits. Accordingly, the Court will deny Poole's Motion.

### III. CONCLUSION

For the reasons stated herein, the Court will grant Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 21) and deny Poole's Motion for Injunctive Relief (ECF No. 32). The Court will also deny as moot Poole's Motion for Clerk to Send Copy of Plaintiff's Response to Defendants (ECF No. 24). A separate Order follows.

/s/
March 26, 2019  
Date  
George L. Russell, III  
United States District Judge