IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC VON POOLE                    *

     Plaintiff,                 *

v.                                *              Civil Action No. GLR-17-1594

NBCI, et al.                      *

     Defendants.                *
                           *****

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants North Branch Correctional Institution ("NBCI"), Warden Frank B. Bishop, Jr., Assistant Warden Jeff Nines, Chief of Security William Bohrer, Chaplain Kevin Lamp, Captain Ronald Ketterman, Lieutenant Thomas Sawyers, Sergeant Robert Werner, Lieutenant Gregory Forney, Officer Larry Gilpin, Lieutenant Patrick Speir, Lieutenant Charles Bielanski, Lieutenant Jeffrey Haggard, Lieutenant Patricia Wiley, Officer Joshua Tart, and Correctional Dietary Manager Parrish Kammauf's (collectively, "NBCI Defendants") Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 36) and Plaintiff Eric Von Poole's Motion for Temporary Restraining Order, Reconsideration for Appointment of Counsel and Order Granting the Plaintiff's Request and Additional Exhibit(s) (ECF No. 38).[1] This 42 U.S.C. § 1983 (2018) action arises from the disciplinary action taken against

---

[1] Also pending before the Court is Defendants Wexford Health Sources, Inc., Mahboob Ashraf, M.D., and William Beeman, R.N.'s Motion to Strike and Opposition to the Motion for Temporary Restraining Order, (ECF No. 39), which the Court will address in conjunction with Poole's Motion.

Poole at NBCI in 2016 and 2017. The Motions are ripe, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons stated herein, the Court will grant Defendants' Motion in part and deny it in part and grant Poole's Motion in part and deny in part.

## I. BACKGROUND[2]

### A. Factual Background

Poole is an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland who has filed several Administrative Remedy Procedure ["ARP"] complaints and helped at least one other inmate pursue legal redress during his term of confinement. (Compl. at 1, 4–7, ECF No. 1; Am. & Suppl. Compl. ["Suppl."] at 9, ECF No. 4).[3] On September 1, 2016, Poole sent a letter to an attorney on behalf of inmate Andrew Dicks, a plaintiff in a case that "was about to go to settlement" in this Court. (Compl. at 5).[4] The letter, dated August 29, 2016, includes ARPs Poole and four other

---

[2] Unless otherwise noted, the facts outlined here are set forth in Poole's Complaint (ECF No. 1) and Amended Complaint and Supplement (the "Supplement") (ECF No. 4). As noted in its March 26, 2019 Memorandum, the Court construes the Complaint and Supplement together as the operative complaint. (Mar. 26, 2019 Mem. at 7 n.7, ECF No. 43). To the extent the Court discusses facts that Poole does not allege in his Complaint and Supplement, they are uncontroverted and the Court views them in the light most favorable to Poole. The Court will address additional facts when discussing applicable law.
  The Court discusses only Poole's allegations against the NCBI Defendants. The Court granted summary judgment in favor of Wexford Health Sources and its employees (collectively, the "Medical Defendants") on March 26, 2019. (Mar. 26, 2019 Mem. & Order, ECF Nos. 43, 44).

[3] Citations to the Complaint refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

[4] In the case referenced by Poole, this Court denied a summary judgment motion filed by former Warden Bobby Shearin on a claim that during the 2013 Ramadan, participants were not provided the same daily caloric intake as inmates in the general

inmates filed against the NBCI dietary department regarding violations of requirements for meals during Ramadan in 2013, notes the same violations persisted during Ramadan in 2016, and states that the same policies at issue in Dicks' case were still being enforced. (Suppl. Exs. 1–25 ("Exhibit A") at 2–3, 16–40, ECF No. 4-1).[5] On July 27, 2016, Poole had filed ARP NBCI 1682-16, alleging that the NCBI Dietary Manager, Kammauf ("Manager Kammauf"), and the shift Dietary Supervisor failed to provide him with the proper diet during the Islamic month of fasting and prayer, Ramadan, which ended July 5, 2016 and did not tell him to pick a meal for the Eid-ul-Fitr feast on July 6, 2016. (Defs.' Mot. to Dismiss Altern. Mot. Summ. J. ["Defs.' Mot."] Ex. 26 ["ARP 1682-16 Documents"] at 32, ECF No. 36-30).

In response to Poole's September 6, 2016 appeal of NBCI 1682-16, which complained about the food provided to the 2016 Ramadan adherents, the investigation

---

population despite an existing policy requiring them to do so. See Dicks v. Shearin, ["Dicks"] No. GLR-14-2384 (D.Md. closed Dec. 28, 2016), Sept. 28, 2015 Mem. Op. & Order, ECF Nos. 20, 21. This Court observed, in pertinent part: that Warden Shearin was not following the Division of Correction's policy; and that Dicks lost over ten pounds as a result because he "faced a choice of eating insufficient calories and suffering weight loss and discomfort or violating his religious beliefs by not fasting during Ramadan to obtain sufficient caloric intake." See Dicks Sept. 28, 2015 Mem. Op. at 8, ECF No. 20. The Court appointed counsel for Dicks, see Sept. 28, 2015 Order, ECF No. 21, and during the period of time at issue in the instant case, the parties in Dicks were mediating, see Nov. 14, 2017 Status Report, ECF No. 46. They reached a settlement agreement that resulted in the dismissal of the case, see ECF Nos. 51, 52.

[5] Citations to the Exhibits to Poole's Supplement are to the pagination the Court's CM/ECF system assigned. For ease of reference, the Court will refer to Exhibits 1–25 to Poole's Supplement collectively as Exhibit A, (ECF No. 4-1), and Exhibits 26–57 to Poole's Supplement as Exhibit B, (ECF No. 4-2).

summary written by Scott Steininger[6] for the Commissioner's review indicates that: "Inmate Poole voluntarily elected to participate in the Ramadan observance. Inmate Poole's weight on 5/24/16 was 240 lb. and his weight on 8/31/16 was 251 lb. The meal selected for the inmate religious group was moved to the night of the Eid-ul-Fitr as stipulated in the policy." (ARP 1682-16 Documents at 15). Based on his investigation, Steininger recommended dismissal of the ARP appeal, reasoning that the regular diet meal and the Ramadan enhanced dinner meal standards were being met. (Id. at 16). Further, Steininger noted that Poole had gained weight during Ramadan and his complaint that he was not permitted to individually select a meal from the menu for the Eid-ul-Fitr feast was meritless as that meal was selected for the entire group. (Id.). On October 18, 2016, the Commissioner adopted the suggested rationale for dismissal of the ARP appeal. (Id. at 1). No appeal of the Commissioner's dismissal was received by the Inmate Grievance Office ("IGO"). (Hassan Decl. ¶ 3, ECF No. 36-33).

On October 17, 2016, Lt. Speir removed Poole from his single cell. (Compl. at 5). Defendants aver that they transferred Poole from Housing Unit ("HU") 3 to HU 2[7] because

---

[6] Steininger was never served with the Complaint, and counsel for NBCI Defendants has not entered an appearance for him. (See ECF Nos. 27–30). As a result, the Court will direct the Clerk to mail copies of the Complaint, Supplement, this Memorandum Opinion to the Litigation Coordinator for NCBI to determine if electronic service on behalf of Steininger will be accepted.

[7] Under applicable regulations, a transfer from HU 2 to HU 3 requires that an inmate must be housed at NBCI for at least one year; has been out of segregation for six months following a Category I, II, or III rule violation; has refrained from assaulting staff for three years; and must be willing to forfeit any unit-specific job assignment. See NBCI Institutional Directive on Inmate Transfers and Housing, § F, ECF No. 36-8). Further considerations involve whether the inmate to be moved is participating in programming that would be terminated by the move and review by the NBCI Intel Department to ensure

4

of a heightened concern regarding inmate-on-inmate assaults, tensions among rival prison gangs or Security Threat Groups ("STGs"), and a shortage of bed space. (Sawyers Decl. ¶ 5, ECF No. 36-5; Forney Decl. ¶ 6, ECF No. 36-9). Poole is not a validated member of an STG, but at the time he was moved, "it was believed that he may have been involved in . . . inciting other inmates to act out inappropriately." (Sawyers Decl. ¶ 5; Forney Decl. ¶ 6; see also Defs.' Mot. Ex. 27 ["ARP NBCI 2453-16 Documents"] at 4, ECF No. 36-31).

HU 2 is a special management unit that provides "a closer level of inmate monitoring for security." (Sawyers Decl. ¶ 6). When Poole arrived at HU 2, he refused to accept the top bunk he was assigned because of his medical issues, which included a hip replacement. (Id. ¶ 8; Compl. at 5). Poole received a Notice of Infraction for refusing to obey an order and refusing a housing assignment. (Sawyers Decl. ¶ 8). Poole was then assigned to Administrative Segregation Pending Adjustment ("ASPA") in HU 1. (Id.).[8]

_____

there are no conflicts. (Id.). Inmates who are "Max II" are required to meet all of the noted criteria, be reduced to Max I level, and be housed in the general population area of HU 2 for a minimum of six months. (Id.).

    [8] The Division of Correction Manual (DOC.100.0002) concerning Case Management provides guidelines for assignment to administrative segregation when an inmate is identified as a threat to the security of the facility or the safety of others. (DOC Manual 100.0002 at 2–5, ECF No. 36-7). When an inmate is placed on administrative segregation, the manual requires designated staff to provide the inmate with a copy of the Notice of Assignment to Administrative Segregation "within 24 hours of the placement, unless placed pending a disciplinary hearing." (Id. § 2(a)). An initial review is required "within five working days of the inmate's placement on segregation" during which the "inmate shall have the opportunity to respond to the reasons stated for being placed on administrative segregation." (Id. § 2(b)(i)).

    When an inmate is assigned to ASPA status, the procedures differ and require only that the inmate receive notification of the rule violation and that the placement satisfies § B.1 of the manual. (Id. § 2(d)(i)). That section states that an inmate may be placed in administrative segregation "in response to a potential threat to the safety, security, and good order of the facility, when there is reason to believe the placement of an inmate on

According to Lt. Patrick Speir, the unit manager of HU 3 when he assigned Poole to a single cell, Poole's personal property was inventoried shortly after he arrived at HU 1 and he was permitted authorized items of property for segregation inmates. (Speir Decl. ¶ 6, ECF No. 36-10; Suppl. at 4).[9] Poole's adjustment hearing for the October 17, 2016 infraction was scheduled to take place on November 1, 2016, but the hearing officer postponed it because of witness availability issues and rescheduled it for December 1, 2016. (Speir Decl. ¶ 10).

On November 1, 2016, Poole filed ARP NBCI 2453-16, claiming NBCI staff retaliated against him for being a "jailhouse lawyer," (ARP NBCI-2453-16 Response at 4, ECF No. 36-31), by moving him to a "MAX II/STG" building with modified movement, assigning him to a top bunk despite his medical issues, and denying him regular use of the law library, access to the "Big Library," and the daily inside recreation general population inmates receive. (Compl. at 5). Poole alleges Officer Tart, who worked on HU 1 B-tier,

administrative segregation will reduce that threat." (Id. at 2, § B(1)). One example listed for reasons supporting assignment to ASPA status is "[p]ending an investigation, disciplinary proceedings, or both where there is reason to believe the inmate might otherwise intimidate potential witnesses or pose a threat to the security of the facility." (Id. at § B(2)(b)). Poole was assigned to ASPA for refusing to accept a cell assignment. (Sawyers Decl. ¶ 5).

[9] Poole alleges Chief of Security William Bohrer is in charge of the Intel Unit for NBCI and has the authority to issue orders regarding when and for how long an inmate may be assigned to an Isolation/Contingency Cell. Suppl. at 4. According to Poole, Bohrer is the person who is responsible for assigning Poole to an isolation cell without access to his property for forty-five days despite the absence of any evidence that Poole presented a threat to the security of the institution. Id. Poole alleges Lt. Speir, Capt. Ketterman, and the supervisors of HU 1, Sgt. Bielanski and Sgt. Warner, all knew he was being held an isolation cell without his property and without good cause. (Suppl. at 4–5). Poole alleges Lt. Speir assigned Poole to a single cell to convince Poole not to pursue his claim raised in ARP NBCI-1325-15. (Id. at 4).

destroyed certain of Poole's ARPs and, on November 15, 2016, attempted to pry open institutional request slips Poole submitted and which were later processed in December 2016 by Sgt. Forney. (Suppl. at 6, ECF No. 4). Ofc. Tart denies that. (Tart Decl. ¶ 4, ECF No. 36-28).

At the December 1, 2016 hearing regarding Poole's refusal to accept a cell assignment, the charges were dismissed, and Poole was transferred from HU 1 to HU 2. (Speir Decl. ¶¶ 10–11; Sawyers Decl. ¶ 9; Compl. at 5).[10] On December, 8, 2016, Poole "was seen by chronic care" and assigned to a medical cell. (Compl. at 5). The December 8, 2016 medical order indicates that Poole should be assigned to a "medical cell" but does not specify "single cell" although there is a space for doing so on the form. (Defs.' Mot. Ex. 20 ["Medical Order"] at 3, ECF No. 36-24). On December 20, 2016, Poole was moved to a Medical Cell in HU 2 per the earlier medical order. (Sawyers Decl. ¶ 10). On January 12, 2017, a cellmate joined Poole in his medical cell. (Compl. at 6).

On January 16, 2017, Nurse Krista Bilak saw Poole and told him that a recent orthopedic consult indicated a problem with Poole's hip replacement that required follow-up. (Id.). Sgt. Forney[11] was called into the medical room where Bilak was examining Poole, and Bilak explained that Poole's hip replacement and his ongoing rehabilitative therapy required the medical cell's full space and features. (Id.). Sgt. Forney became "visibly

---

[10] Poole states that, according to a prison institutional directive (NBCI ID 230.0004), only inmates who are found guilty of a Category one, two or three infractions are supposed to be placed into HU 2. Poole had never been placed on Administrative Segregation prior to his move to HU 2. (Compl. at 5).

[11] Sgt. Forney is now a lieutenant, but at all times relevant to the Complaint, he held the rank of sergeant.

angry" and, alluding to Poole's litigiousness, told him that he would have a roommate in his medical cell no matter how much he complained. (Id.). While the medical cell is equipped with handrails and other accessibility features, according to Lt. Sawyers, the cell is still designated as a double-occupancy cell. (Id.). Segregation cells are designated as double occupancy cells unless there is a specific reason requiring an inmate to be housed in a single cell. (DOC Manual 100.0002, Special Confinement Housing § F(2), ECF No. 36-7).

During the move to the medical cell, Sgt. Forney told Poole he would not be allowed to attend religious services by order of the NBCI Administration, which had created a schedule permitting Sunni Muslims housed in HU 2 to attend services on specified dates in order to ensure there were no issues with rival gangs. (Compl. at 6, 8). On December 20, 2016, Poole was not allowed to attend Sunni Worship services. (Id. at 5). According to Chaplain Lamp, when an inmate misses three consecutive religious services, his name is removed from the pass list. (Lamp. Decl. ¶ 8, ECF No. 36-15). The inmate must put in a request to be put back on the list. (Id.). According to Lamp, inmates in HU 2 who are not assigned to segregation status are "only permitted to attend in-house congregative Friday [Jumu'ah] Services with the Sunni Worship Group." (Id. at ¶ 9). Without explaining why Poole was unable to attend Jumu'ah, Lamp concludes that he has "never interfered . . . with . . . Poole's ability to attend [HU 2] Friday [Jumu'ah] Services with the Sunni Worship Group." (Id. at ¶ 10). Poole attempted to submit an ARP regarding the alleged denial of attendance at the religious services despite submitting request slips in advance, but he alleges it was pushed back under his door without being processed. (Compl. at 5). Sgt.

Forney warned Poole "to stop filing remedies." (Id.). Forney generally denies refusing to properly process ARPs submitted by Poole but does not address the allegation that he told Poole to stop filing remedies. (Forney Decl. ¶ 5).

On January 19, 2017, Poole mailed an "Emergency Remedy" to the Commissioner's Office because Lt. Sawyers and Sgt. Forney refused to remove his cellmate from the medical cell, to allow him to attend religious services, or to process Poole's ARPs. (Compl. at 6). On January 25, 2017, Poole received notification from the Commissioner's office that his Emergency Remedy had been referred to the Warden for a response. While waiting for a formal response, Poole spoke directly with Warden Bishop, detailing his concerns about his housing assignments and his exclusion from religious services and recreation, and reminding the Warden that he is not a member of a gang. (Compl. at 7).

On March 30, 2017, Lt. Sawyers told Poole that he would "remain in HU 2 for the foreseeable future due to Intel reasons." (Compl. at 7). Lt. Sawyers explained on a routing slip for Warden Bishop that Poole had been moved to HU 2 for "possibly inciting other inmates last October in HU 3, during a very tense time with gangs." (Id.). Lt. Sawyers recommended that Poole remain in HU 2 due to ongoing gang issues. (Id.). Also on March 30, 2017, Poole filed an ARP (NBCI-0778-17), in which he complained that employees of the prison medical contractor, Wexford Health Sources, Inc., had neither followed the orthopedist's recommendations nor conveyed those recommendations to the Warden so that Poole could live in a suitable cell. (Defs.' Mot. Ex. 28 ["ARP NBCI-0778-17"], ECF No. 36-32). That ARP was dismissed on May 15, 2017. (Id. at 1, 4–17).

On May 9, 2017, Poole learned from his mother that his father was gravely ill. (Id.). She told him that she had called the Warden's office the day before, but Poole did not learn of his father's condition until he spoke with his mother. (Id.). Two days later, an NBCI social worker informed Poole that his father had passed away on May 10, 2017. (Compl. at 8). Poole "was told" that he would be called to the Chaplain's office on May 12, 2017 in order to use the phone in private, but that did not happen. (Id.). On May 12, 2017, Poole told Sgt. Forney that his father passed away and that he wanted to see Chaplain Lamp so he could call his family outside the presence of other inmates. (Compl. at 8). A correctional officer later informed Poole that Sgt. Forney had denied his request to speak with Chaplain Lamp because Poole had been on the phone four times since he learned his father was ill. (Id.). Lamp states that he has no recollection of Poole asking to be allowed to use the phone privately following the news of his father's death. (Lamp Decl. ¶¶ 4–6).

On May 27, 2017, Ramadan began, and NBCI staff marked Poole's cell door to signify he was participating. (Compl. at 8). Poole alleges that Lt. Haggard and Lt. Patricia Wiley, food service supervisors at NBCI, failed to include with his dinner meal the attached bag meal to make up for the calories he missed earlier in the day, violating NBCI guidelines and the Court's decision in Dicks.[12] (Id.). According to the Dietary Manager for NBCI, Ramadan participants receive "a breakfast meal before sunrise and an Enhanced Dinner

---

[12] Poole notes this was at issue in the litigation fellow inmate Andrew Dicks brought in this Court. See Dicks v. Shearin, Civ. No. GLR-14-2384 (D.Md. 2014 closed Dec. 28, 2016). Poole claims Lt. Haggard and Lt. Wiley are responsible for ensuring that the proper amount of calories as detailed in OPS 160.0001, Appendix 1, are provided during Ramadan to the participants, but failed to do so during 2016 and 2017. (Suppl. at 6).

Meal after sunset which provides various larger portion sizes to ensure adequate caloric intake in accordance with the established requirements." (Kammauf Decl. ¶ 5, ECF No. 36-18). Kammauf states that during the 2016 and 2017 Ramadan observances, the dinner meals provided to participants met the standards established in the "Observances With Food Requirements/Meal Adjustments" for those years. (Id. ¶¶ 6–7).[13] Poole also alleges that Steininger, the Correctional Dietary Manager for the Western Region of DPSCS, is responsible for ensuring NBCI is complying with requirements for meals during Ramadan. (Suppl. at 6). Poole alleges NBCI did not comply with those directives for Ramadan 2017. (Id.; see also Defs.' Mot. Ex. 26 ["Headquarters Investigative Summary"] at 14–16, ECF No. 36-30).

## B.  Procedural Background

On June 9, 2017, Poole sued NBCI and several associated officials and employees. (ECF No. 1).[14] On June 15, 2017, Poole filed an Amended and Supplemental Complaint

---

[13] Also attached to the Supplement as an exhibit is a document memorializing a May 31, 2017 meeting of inmate religious leaders and representatives from HU 3 and HU 4 with NBCI Asst. Warden Nines, Chief Bohrer, Manager Kammauf, Chaplain Lamp, and others. (Suppl. Ex. A at 42, ECF No. 4-1). The document, which does not indicate who wrote it, states that NBCI staff had agreed to serve Ramadan participants breakfast trays instead of breakfast bags. (Id.). When the inmate religious leaders asked about how many services would be provided to Ramadan participants confined to HU 2, staff explained that there were space limitation problems in HU 2 as it "only has 2 small rooms to be shared among 7 groups for Ramadan." (Id.). They further explained that "[o]nly 8 inmates are permitted in each group with the further restriction of separating STGs" but that each group would be permitted 4 out of 5 services. (Id.).

[14] Poole also sued the State's medical services contractor, Wexford Health Sources ("Wexford") and several Wexford employees (collectively, the "Medical Defendants"). On March 26, 2019, the Court granted summary judgment in favor of Medical Defendants. (Mar. 26, 2019 Order, ECF No. 44).

(the "Supplement"), naming several more NBCI employees as Defendants and clarifying his claims against them, alleging under 42 U.S.C. § 1983: cruel and unusual punishment in violation of the Eighth Amendment (Count I); denial of due process in violation of the Fourteenth Amendment (Count II); and denial of his right to practice his religion and to petition the courts in violation of the First Amendment to the U.S. Constitution, as well as retaliation for exercising his First Amendment rights (Count III). (Suppl. at 1–8). Poole also makes claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a) (2018). (Id. at 3, 5). He seeks money damages, his attorney's fees and costs, and declaratory relief. (Id. at 8).

On February 5, 2019, NBCI Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 36). On June 24, 2019, Poole filed an Opposition. (ECF No. 49). To date, the Court has no record NBCI Defendants filed a Reply.

On February 11, 2019, Poole filed a Motion for Temporary Restraining Order, Reconsideration for Appoint of Counsel and Order Granting the Plaintiff's Request and Additional Exhibit(s). (ECF No. 38). On February 21, 2019, Wexford Health Sources, Inc., Mahboob Ashraf, M.D., and William Beeman, R.N.'s (collectively, with Ryan Browning, L.P.N., "Medical Defendants") filed an Opposition and Motion to Strike. (ECF No. 39). To date, the Court has no record NBCI Defendants filed an Opposition.

## II.    DISCUSSION

### A.    Poole's Motion[15] and Medical Defendants' Motion to Strike

In his Supplement, Poole brought claims against Medical Defendants, alleging they violated Poole's Eighth Amendment rights by failing to follow "orthopedic consult recommendations so they could pass on the recommendations so DPSCS could find a[n] accommodating facility" where Mr. Poole could properly exercise. (Suppl. at 8). On March 26, 2019, the Court granted summary judgment in favor of Medical Defendants and denied Poole's Motion for Injunctive Relief. (Mar. 26, 2019 Mem. Op. & Order, ECF Nos. 43, 44).

#### 1.    Poole's Motion for Order Granting the Plaintiff's Request and Additional Exhibit(s) and Medical Defendants' Motion to Strike

In his Motion, Poole seeks to add exhibits to his pleadings, including a Consent Order of Reprimand issued by the Maryland Board of Nursing against Nurse Beeman. In their Motion, Medical Defendants move to strike the portion of Poole's exhibits regarding Nurse Beeman's reprimand as irrelevant to the issues raised in Poole's Complaint and prejudicial to Nurse Beeman. Upon consideration, the Court agrees that Poole's inclusion of the Consent Order of Reprimand is not relevant to Poole's pleaded claims, appears to be offered for an improper purpose, and concerns a matter which is moot in light of the Court's March 26, 2019 Order granting summary judgment in favor of Medical Defendants. As a result, the Court will deny this part of Poole's Motion and grant Medical Defendants'

---

[15] The Court will address Poole's request for appointed counsel, (see Pl.'s Mot. at 1–2, 6, ECF No. 38), after addressing NBCI Defendants' Motion.

Motion to Strike that portion of the Exhibits (Pl.'s Mot. Ex. C ["Medical Exhibits"] at 25–31, ECF No. 38-3).

### 2. Poole's Motion for TRO

Poole also seeks an Order requiring his transfer from NBCI to facilitate his participation in rehabilitative therapy. He maintains that a temporary assignment to one of the Jessup prisons would permit him to perform the exercises required to rehabilitate his leg and claims that the retaliatory actions of denying him a medical cell, which he equates to a single cell, could be addressed through his transfer. On March 26, 2019, the Court denied Poole's request for injunctive relief for purposes of the asserted need for rehabilitative therapy. (Mar. 26, 2019 Mem. Op. at 19–20). For the same reasons the Court denied Poole's request for injunctive relief in its March 26, 2019 Memorandum Opinion, the Court will deny Poole's pending TRO request.

## B. Defendants' Motion

### 1. Conversion of Defendants' Motion

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the

pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." <u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" <u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 244 (4th Cir. 2002) (quoting <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified

reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, Poole was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. Poole cites Rule 56(d) in his Opposition, (see Pl.'s Mem. L. Supp. Pl.'s Opp'n Defs.' Mot. Dismiss Summ J. ["Pl.'s Opp'n"] at 6), but does not include a Rule 56(d) affidavit. The only discovery he specifically requests is a letter he wrote to the U.S. Department of Justice about his treatment at NBCI, which will "show the trier of fact that this is a gross pattern of rogue behavior by public officials." (Pl.'s Opp'n at 21). But Poole does not explain why that letter would "by itself create a genuine issue of material fact sufficient to defeat summary judgment" regarding his, and the Court does not see how it would, given the voluminous documentation the parties have submitted as exhibits. See Ingle, 439 F.3d at 195 (4th Cir. 2006) (quoting Strag, 55 F.3d at 953). Both requirements for conversion have therefore been satisfied. See Greater Balt. Ctr., 721 F.3d at 281. Accordingly, the Court will treat Defendants' Motion as one for summary judgment.

## 2.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3. Analysis

#### a. Exhaustion of Administrative Remedies

Defendants raise the affirmative defense that Poole has failed to exhaust administrative remedies with regard to all of his claims except his First Amendment retaliation claim. (See Defs.' Mot. at 30; Hassan Decl. ¶¶ 2–3, ECF No. 36-33 (indicating that Poole only filed a complaint with the IGO regarding his retaliation claim)).

The Prisoner Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2018). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of,

sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." Id. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

The PLRA's exhaustion requirement serves several purposes, including "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Jones v. Bock, 549 U.S. 199, 219 (2007); see Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). By design, prisoners must pursue administrative grievances through all available appeals until they receive a final denial of the claims. Chase, 286 F.Supp. at 530.

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford, 548 U.S. at 93 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). But, the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured

from the action or inaction of prison officials." <u>Aquilar-Avellaveda v. Terrell</u>, 478 F.3d 1223, 1225 (10th Cir. 2007); <u>see</u> <u>Kaba v. Stepp</u>, 458 F.3d 678, 684 (7th Cir. 2006).

There is an established administrative remedy procedure process that applies to all Maryland prisons, which consists of multiple steps. <u>See</u> COMAR 12.02.28.01, <u>et seq</u>. First, a prisoner is required to file his ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under Md. Code Ann., Corr. Servs. ["C.S."] § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." The ARP request must be filed within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

If the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame, the prisoner has thirty days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5). If the Commissioner of Correction denies an appeal, the prisoner has thirty days to file a grievance with the IGO.[16] COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal

---

[16] If the Commissioner fails to respond, the grievant shall file their appeal within thirty days of the date the response was due. COMAR 12.07.01.05(B)(2).

filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing." C.S. § 10-207(b)(1); see also COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). Thus, Poole's failure to appeal the Commissioner's response to his First Amendment claims and the alleged failure to follow medical directives is a failure to properly exhaust administrative remedies.

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In Ross v. Blake, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA," rejecting a "special circumstances" exception to the requirement. 136 S.Ct. 1850, 1855–57 (2016). But the Court reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" Id. at 1855. An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" Id. at 1859 (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)); see also Moore, 517 F.3d at 725 (noting an administrative remedy is not "available if a prisoner, through no fault of his own, was prevented from availing himself of it"). Thus, an inmate must complete the prison's internal appeals process, if possible, before filing suit. See Chase, 286 F.Supp.2d at 529–30. Exhaustion is required before filing suits targeting unconstitutional conditions as well as those concerning unconstitutional conduct. See Porter, 534 U.S. at 528. Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. See Booth, 532 U.S. at

741 (requiring exhaustion even where prisoner only sought money damages, which he could not receive through the prison grievance process).

The <u>Ross</u> Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S.Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Id.</u> Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." <u>Id.</u> The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Id.</u> at 1860.

Here, Poole filed a complaint with the IGO regarding his First Amendment retaliation claim. Poole relies on the third <u>Ross</u> circumstance to excuse his failure to file a grievance with the IGO with respect to his other claims. Poole asserts throughout his pleadings that he was threatened by Sgt. Forney when he attempted to file an ARP and that Tart and Sawyer failed to process other ARPs Poole attempted to file. Defendants deny destroying Poole's ARPs or making threats regarding his continued complaints. As a result, there exists a genuine dispute of material fact with regard to the availability of the administrative remedy process for Poole's claims. Accordingly, the Court will deny NBCI Defendants' Motion to the extent it seeks to dismiss Poole's claims on exhaustion grounds.

### b.    Poole's Claims

#### i.    First Amendment Retaliation

Defendants argue that Poole has failed to support his claim that Warden Bishop, Chief Bohrer, Capt. Ketterman, Lt. Sawyers, Lt. Speir and Sgt. Forney moved Poole to more restrictive housing in retaliation for filing ARPs, assisting others in doing the same, and for contacting counsel for Andrew Dicks. Poole maintains that he has.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the he engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large, . . . incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017). A

plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine, 411 F.3d at 500). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. See Constantine, 411 F.3d at 501. This showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. Id.

Here, Poole has created a genuine dispute of material fact as to whether Defendants retaliated against him for exercising his First Amendment right to file ARPs and help Dicks with his legal case. First, Poole drafted ARPs for himself and other inmates and provided information to the attorney representing Andrew Dicks in the summer of 2016. This constitutes protected First Amendment activity. Booker, 855 F.3d at 545.

With regard to adverse action, on October 17, 2016, Lt. Speir, allegedly at Chief Bohrer's direction, moved Poole to HU 2 based on a belief that Poole instigated inappropriate behavior among other inmates. Poole's move to HU 2, admittedly a more restrictive housing assignment, is sufficiently adverse to support a retaliation claim. Cf. Martin, 858 F.3d at 250 (finding that placing an inmate in administrative segregation constitutes an adverse action).

With respect to causation, Poole's move to more restrictive housing occurred less than two months after his ARPs and participation in and assistance with the Dicks case. Poole asserts that Defendants' security rationale was a ruse to cover up their true retaliatory

motive, and Defendants have not provided support for their position that Poole was instigating inappropriate behavior. Further, though Defendants point to gang violence at the time of Poole's transfer to HU 2, they admit that Poole was never validated as a member of any STG and do not implicate him in that spate of violence. Lt. Sawyers and Sgt. Forney merely state that "it was believed" that Poole was instigating inappropriate behavior by other inmates, (Sawyers Decl. ¶ 5; Forney Decl. ¶ 6), leaving unanswered questions about who believed that and why. Such conclusory statements fall short of establishing a legitimate security concern. See Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 217 (4th Cir. 2016) (defendants can offer legitimate and permissible reasons for their action to refute retaliation claim). Defendants' statements do not support imposing more restrictive housing on an inmate well known for filing ARPs and helping other inmates with their litigation regarding conditions of confinement, including their religious exercise during Ramadan. See Booker, 855 F.3d at 540 ("[I]f an inmate exercises his First Amendment right when he files a prison grievance, retaliation against him for doing so is unconstitutional."). In short, there is a genuine dispute of material fact concerning the true reason Defendants moved Poole to more restrictive housing.

ii.     **Free Exercise and RLUIPA**

Defendants argue that Poole has failed to state a claim with respect to his allegations that they did not allow him to attend Jumu'ah services or provide him Ramadan meals in accordance with the applicable policy.[17] Poole maintains that he has.

_____

[17] Poole claims the failure to permit him to speak privately with his family or attend religious services following his father's death has denied him the opportunity to properly

### aa.    Jumu'ah Services

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. See Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam). That right, however, can be limited. Prison restrictions that impact the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. See Turner v. Safely, 482 U.S. 78, 89–91 (1987). To determine if the restrictions are justified requires examination of: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives" to the regulation, which "is evidence of [its] reasonableness." Matherly v. Andrews, 859 F.3d 264, 281 (4th Cir.) (quoting Turner, 482 U.S. at 89–90). Under this test,

---

grieve and that Sgt. Forney's denial of his request is a part of the "constant retaliation" he suffers. (Compl. at 8). Other than this reference to retaliation, which is addressed above, Poole does not state a cognizable claim. The undisputed facts establish that Poole spoke with his family several times and was advised in a timely manner of the death of his father. Poole does not explain how Defendants violated his constitutional or RLUIPA rights in this regard.

the Court is required to give deference to prison administrators' policy explanations. See Lovelace v. Lee, 472 F.3d 174, 182 (4th Cir. 2006) ("We confirm emphatically that any substantive explanation offered by the prison must be viewed with due deference."). Maintaining institutional safety and security are compelling state interests. Cutter v. Wilkinson, 544 U.S. 709, 722–23 (2005). Negligent interference with free exercise rights, "causing unintended denials of religious rights" is not actionable under § 1983, only intentional acts. Lovelace, 472 F.3d at 201.

Here, Poole targets his inability to attend Jumu'ah services from December 2, 2016, the date that Poole was no longer designated ASPA, until August 11, 2017, two months after he filed suit. (See Pl.'s Mot. Prelim. Injunc. ["Pl.'s PI Mot."] Ex. 1 ["ARP NBCI 1673-17 regarding Ramadan 2017"] at 32–34, ECF No. 38-1). According to Chaplain Lamp, Poole's name was removed from the pass list for Jumu'ah because he could not attend the services while he was on segregation status. In order to attend thereafter, Poole needed to submit a request to be placed back on the pass list. According to Lamp, Poole did not submit such a request and therefore did not receive passes to attend the services. Poole, however, alleges that he submitted request slips to be put on the list and that, when he filed an ARP regarding the failure to put him on the list, Sgt. Forney told him to stop filing ARPs.

The policy that Lamp describes in his declaration passes the Turner test in that it restricts access to group religious service for inmates in segregation in the interest of security. Generally, the Court defers to prison administrators' policy explanations, especially when concerning institutional safety and security. Here, however, the decision

to transfer Poole to HU 2, which he alleges was retaliatory, and not to transfer him back to HU 3 had the effect of preventing him from attending religious services. Poole alleges he submitted requests to get back on the Jumu'ah pass list and spoke to several prison officials, yet was kept off the list for months. As discussed in the context of his retaliation claim, Defendants' concern about Poole's involvement in gangs or STGs has not been substantiated. Therefore, in denying Poole access to weekly religious services for some nine months, there is a genuine dispute of material fact as to whether Defendants have violated his Free Exercise rights under the First Amendment.

RLUIPA prohibits government officials from imposing a substantial burden on an inmate's religious exercise unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). A substantial burden on religious exercise occurs when a government, by act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace, 472 F.3d at 187 (quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 717, 718 (1981)). "Although RLUIPA must 'be construed in favor of a broad protection of religious exercise,' it must be applied 'with particular sensitivity to security concerns.'" Couch v. Jabe, 679 F.3d 197, 201 (4th Cir. 2012) (internal citation omitted) (quoting Cutter, 544 U.S. at 722). "In this regard, 'RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety.'" Id. (alteration in original) (quoting Cutter, 544 U.S. at 722). The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. See, e.g., Krieger v. Brown, 496

F.App'x 322, 324 (4th Cir. 2012). If the plaintiff satisfies his burden, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc-1(a).

For the same reasons there is a genuine dispute of material fact as to Poole's Free Exercise claim regarding access to Jumu'ah services, there is also a genuine dispute of material fact as to his RLUIPA claim. By preventing him from attending religious services for nine months, Defendants have put pressure on him to modify his behavior and violate his religious beliefs. The Court is sensitive to prison safety concerns, but in Poole's case, Defendants continue to rely on gang or STG concerns to restrict Poole's movement without offering evidence that he is in any gang or STG. It is unreasonable, and not the least restrictive alternative, to keep him from practicing a tenet of his religion for nine months on the basis of vague safety concerns.

### bb.    Ramadan Meals

"Under both the Free Exercise Clause and RLUIPA in its most elemental form, a prisoner has a 'clearly established . . . right to a diet consistent with his . . . religious scruples,' including proper food during Ramadan." Lovelace, 472 F.3d at 198–99 (quoting Ford v. McGinnis, 352 F.3d 582, 597 (2d Cir. 2003)). "A prison official violates this clearly established right if he intentionally and without sufficient justification denies an inmate his religiously mandated diet." Id. at 199 (citing Meyer v. Teslik, 411 F.Supp.2d 983, 991 (W.D.Wis. 2006)).

Here, Poole alleges that Defendants have failed for multiple years to abide by the policy of accommodating Muslim prisoners' dietary needs during the fasting month of

Ramadan. Specifically, in 2017, Poole alleges the NBCI food service staff did not include with his dinner meal an attached meal bag to make up for the calories he missed at lunchtime. Defendants respond that Poole gained weight during Ramadan in 2016 and that they adhered to the policies of providing an enhanced dinner meal in 2017. The Court concludes that, given Poole's history complaining about this issue, the failure to include an attached meal bag, if true, could have been intentional and unjustified. As a result, with respect to his Free Exercise and RLUIPA claims, there is a genuine dispute of material fact as to whether Defendants intentionally and unjustifiably withheld the proper diet from Poole during Ramadan in 2017.

### iii.    Eighth Amendment Conditions of Confinement

Defendants assert that Poole has failed to state a claim that the conditions of his confinement constituted cruel and unusual punishment under the Eighth Amendment. Poole counters that he has.

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." Id. To establish a cruel and unusual punishment claim, a prisoner must prove: (1) that "the deprivation of [a] basic human need was objectively sufficiently serious"; and (2) that "subjectively the officials act[ed] with a sufficiently culpable state of mind." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (alterations in original) (quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)). "These requirements spring from the text of

the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298–300 (1991)).

The objective prong requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Strickler, 989 F.2d at 1381. "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "a serious or significant physical or emotional injury resulting from the challenged conditions." See Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (quoting De'Lonta, 330 F.3d at 770).

To establish the subjective prong, a sufficiently culpable state of mind, there must be evidence that a defendant disregarded a known excessive risk of harm to the inmate's health or safety. See Wilson, 501 U.S. at 298–99. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010) (quoting Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

Here, Poole has not produced evidence of a "serious or significant physical or emotional injury resulting from the challenged conditions." <u>Strickler</u>, 989 F.2d at 1381. Even if the conditions of Poole's confinement were at times restrictive, he has not shown he was injured as a result. The parties argue about whether there are special cells at NBCI and the terminology for them, but that disagreement is of no moment in the absence of an injury. Poole claims he was provided a mattress and two sheets, never received his property, was forced to sit in a cell with no lights, was not provided a blanket although it was cold, and was given one-half a bar of soap after he convinced other inmates to contact his family. (Pl.'s Opp'n at 10, ECF No. 49-1). He further claims that he was forced to take showers without a change of underclothes and without shower shoes, which led to athlete's foot and feet that became "crusty and the toenails so black and brittle." (<u>Id.</u> at 11). These issues are not sufficiently "extreme" to rise to the level of objectively sufficiently serious injury under the Eighth Amendment. <u>De'Lonta</u>, 330 F.3d at 634.

### iv. Access to Courts

Defendants argue that Poole's allegations that he was denied use of the prison libraries do not establish a constitutional violation.

Prisoners have a constitutionally protected right of access to the courts. <u>See</u> <u>Bounds v. Smith</u>, 430 U. S. 817, 821 (1977). However:

> <u>Bounds</u> does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is

simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Lewis v. Casey, 518 U. S. 343, 355 (1996).

To establish an unconstitutional burden on his right of access to the courts, a prisoner must show "'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" O'Dell v. Netherland, 112 F.3d 773, 776 (4th Cir. 1997) (quoting Lewis, 518 U.S. at 355). The "actual injury" requirement "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." Lewis, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. Lewis, 518 U.S. at 352–53 n.3.

The Supreme Court has divided access-to-the-courts claims into two categories. Christopher v. Harbury, 536 U.S. 403, 413 (2002). The first, "forward looking claims," are cases where "official action frustrates a plaintiff's ability to bring a suit at the present time." Jennings v. City of Stillwater, 383 F.3d 1199, 1208 (10th Cir. 2004). The second category, "backward looking claims," arise when a plaintiff alleges that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate settlement of a meritorious case." Id. at 1209 (alterations in original). In this way, the official action is said to have "'rendered hollow [the plaintiff's] right to seek redress'" in the courts. Id. (quoting Christopher, 536 U.S. at 415 (alterations in original)).

A prisoner asserting he was denied access to the courts must prove he suffered an actual injury by showing that the defendant's acts hindered his ability to pursue a non-frivolous legal claim. Lewis, 518 U.S. at 349. Conclusory allegations are not sufficient in this regard. See Wardell v. Duncan, 470 F.3d 954, 959 (10th Cir. 2006) (finding no access-to-court claim where reason for denial of petition for a writ of certiorari was unspecified and the plaintiff did not appeal on that basis). The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher, 536 U.S. at 415. "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." Id. at 416. A prisoner's right to access the courts does not include the right to present frivolous claims. Lewis, 518 U.S. at 353 n.3. It is not enough that a prisoner is prevented from challenging his conviction; he must also show that his claim had merit. Christopher, 536 U.S. at 415.

In his verified pleadings, Poole asserts that he was denied his property, including legal materials he needed to continue a challenge to his conviction. Defendants claim that Poole was provided "authorized items" for inmates assigned to segregation, (see, e.g., Speir Decl. ¶ 6), and submit property inventory sheets as an exhibit, seemingly to refute Poole's claim he was denied access to his property, (Defs.' Mot. Ex. 10, ECF No. 36-14). Neither property inventory sheet bears Poole's signature in the spaces provided for it, nor do Defendants provide a verified statement indicating Poole refused to sign the form or that the property was nonetheless delivered. (See id.). Thus, there remains a dispute of fact pertaining to Poole's claim that he was held in a cell from October 17, 2016 to December

2, 2016, without access to legal materials. The dispute of fact, however, must be <u>material</u> to the underlying claim to warrant denial of summary judgment. <u>Anderson</u>, 477 U.S. at 248.

Poole maintains that he lost a case in the Circuit Court for Baltimore City, Maryland because he "couldn't respond properly to the admission contradicting the 'Writ of Actual Innocence' response." (Pl.'s Opp'n at 14). He states he "was not allowed access to the library or utilize the computers to get the cases to submit the L.A.S.I. forms." (<u>Id.</u>). He further claims he "had a civil action in Allegany Circuit Court, and had to write to the Clerk . . . and asked for the matter to be dismissed [without] prejudice." (<u>Id.</u>).

To establish an access-to-court claim, Poole must describe the lost opportunity to litigate his claim with enough particularity so that the Court can appreciate the merits of such a claim. <u>Christopher</u>, 536 U.S. at 415. It is not incumbent upon this Court to search for or figure out whether Poole's purported challenge to his conviction had merit.[18] <u>Id.</u> at

---

[18] The Court's review of the docket for Poole's "case" in the Circuit Court for Baltimore City does not suggest he lost the opportunity to litigate a meritorious claim. On July 16, 2002, Poole was convicted of murder, kidnapping, robbery, and weapons offenses in the Circuit Court for Baltimore City. <u>State v. Poole</u>, Case Nos. 101192028, 101192034, 101194023 (Balt.City Cir.Ct. 2001 filed July 11, 2001) http://casesearch.courts.state.md.us/casesearch/.On October 27, 2004, Poole filed a post-conviction petition challenging his convictions for kidnapping and weapons offenses, which was denied on June 30, 2005. <u>See</u> <u>State v. Poole</u>, Case No. 101192034 (Balt.City Cir.Ct. 2001). Poole appealed on July 28, 2005, and the Maryland Court of Special Appeals affirmed the denial of post-conviction relief on January 2, 2008. <u>Id.</u> On November 14, 2016, Poole filed another application for leave to appeal, which the Maryland Court of Special Appeals denied on April 13, 2018. The docket shows no intervening proceedings between January 2, 2008 and November 14, 2016. (<u>Id.</u>). The docket in Case No. 101192028, wherein Poole was given a life sentence for aiding and abetting and use of a deadly weapon, shows the same post-conviction challenges. (<u>Id.</u>). Nothing on the electronic docket indicates that Poole had a potentially meritorious claim

416. Here, Poole has provided no details about the challenge to his conviction and has provided no details regarding the civil action[19] he had pending in the Circuit Court for Allegany County. (See Pl.'s Opp'n at 14). Absent such essential details, Poole's claim that he was denied meaningful access to courts fails as he has not demonstrated an actual injury resulting from the deprivation of his legal materials or opportunities to visit the library. As a result, the Court concludes that Defendants are entitled to summary judgment on this claim.

### v.    Due Process

Defendants assert that Poole does not have a protected liberty interest in his housing assignment as the conditions of his confinement were not significantly more onerous than those imposed on the general population. Poole asserts that he was denied due process guaranteed to him under the Fourteenth Amendment when he did not receive a hearing prior to his transfer to HU 2 and when Defendants failed to process his remedies and tore up his ARPs.

In the prison context, there are two different types of constitutionally protected liberty interests which may be created by government action. Sandin v. Conner, 515 U.S. 472, 484 (1995). The first is created when there is a state-created entitlement to an early release from incarceration. Bd. of Pardons v. Allen, 482 U.S. 369, 381 (1987) (state-created

_____

challenging one or more of his convictions which was lost due to his inability to comply with a deadline. Lewis, 518 U.S. at 349.

[19] Further, because Poole admits he voluntarily dismissed his civil claim, see Pl.'s Opp'n at 14, his case was not "lost" because Defendants denied him his right of access to the courts, see Jennings, 383 F.3d at 1209.

liberty interest in parole); Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (state-created liberty interest in good-conduct credits). This type of liberty interest is not implicated here. The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. Thus, before deciding whether Poole is entitled to due process, it must be determined if the conditions under which he was confined constituted "an atypical and significant hardship."

Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise. Beverati v. Smith, 120 F.3d 500, 502–03 (4th Cir. 1997) (quoting Sandin, 515 U.S. at 483–84); accord Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). The Supreme Court found a liberty interest implicated where super-maximum security prison inmates were deprived of almost all human contact, communication between cells was forbidden, exercise was limited to an hour a day in a small room, and inmates were constantly exposed to light. See Wilkinson v. Austin, 545 U.S. 209, 223–25 (2005). The Wilkinson Court noted that the conditions alone were not enough to create a liberty interest in avoiding transfer to that prison, but when coupled with the indefinite duration of assignment to the prison and the disqualification of an otherwise eligible inmate for parole consideration, the conditions "impose an atypical and significant hardship within the

correctional context." Id. at 224. But "Wilkinson does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." Prieto v Clarke, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations combined with . . . harsh and atypical conditions" for due process protections to apply. Id. (citing Wilkinson, 545 U.S. at 223–25).

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015). Where, as in Bevarati, conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population" no liberty interest exists in avoiding that segregation assignment. 120 F.3d at 503. Assignment to administrative segregation does not create an atypical and significant hardship. See Hewitt v. Helms, 459 U.S. 460, 467 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life).

Here, Poole was initially transferred to a more restrictive housing unit as a general population inmate, but when he refused the cell he was assigned to occupy, he was placed on ASPA status and provided with a notice of inmate rule violation. While his disciplinary hearing was delayed, he ultimately received a hearing and the infraction was dismissed. The assignment to ASPA was finite and, unlike the conditions present in the Wilkinson case, there was a definitive end to Poole's housing assignment in ASPA. Further, the notice

of inmate rule violation and the subsequent disciplinary hearing provided Poole with due process.

Poole's transfer to the more restrictive conditions in HU 2, which is enough to trigger a viable retaliation claim, does not represent atypical and significant hardships similar to those at issue in <u>Wilkinson</u>, such that due process protections prior to transfer are constitutionally required. While, as noted, the vague explanation for Poole's transfer to HU 2 is troubling and does not provide a basis for a finding in favor of Defendants' conclusory denial of a retaliatory motive, there is no constitutional requirement that Poole be provided notice and a hearing prior to the move.

### b. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity from all of Poole's claims.[20] The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>West v. Murphy</u>, 771 F.3d 209, 213 (4th Cir. 2014). Qualified immunity protects government officials when they have made "mere mistakes in judgment, whether the mistake is one of fact or one of law." <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978). As "an immunity from suit rather than a mere defense to liability, . . . [qualified immunity] is effectively lost if a case is erroneously permitted to go to trial."

---

[20] Defendants do not argue why they are entitled to qualified immunity on a claim-by-claim basis. They simply argue that Poole has not shown that they violated any of his clearly established rights and that they are therefore entitled to dismissal of every claim against them. (<u>See</u> Defs.' Mot. at 32–33).

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis removed). Accordingly, courts should resolve qualified immunity questions as early as possible. See Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987).

There is a two-prong test to determine if a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown "make out a violation of a constitutional right"; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts have discretion to resolve these two prongs in whichever order they deem appropriate, based on the circumstances of the case. Id. at 236. The answers to both prongs must be in the affirmative for a plaintiff to prevail. Batten v. Gomez, 324 F.3d 288, 293–94 (4th Cir. 2003) (considering the issue in the context of a police officer's motion for summary judgment on qualified immunity grounds). Once the defendant raises qualified immunity as a defense, the plaintiff bears the burden of proof on the first prong, that is, to show a constitutional violation occurred. Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (citing Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993)). The defendant bears the burden on the second prong, that is, to show that the right was not clearly established at the time of the violation. Id. at 378 (quoting Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003)).

The second prong involves a three-step analysis. First, the court identifies "the specific constitutional right allegedly violated." Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990). Second, the court inquires whether at the time of the alleged violation, that right was "clearly established." Id. Third, the court assesses "whether a reasonable person in the

official's position would have known that his conduct would violate that right." Id.; see Cloaninger ex rel. Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009) (explaining that a right is "clearly established" when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (quoting Saucier, 533 U.S. at 202)).

To determine if a right was "clearly established," a district court must first examine "cases of controlling authority" in its jurisdiction," that is, "decisions of the Supreme Court, [the] court of appeals, and the highest court of the state in which the case arose." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017) (first quoting Amaechi v. West, 237 F.3d 356, 363 (4th Cir. 2001); then quoting Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004), cert. denied, 138 S.Ct. 755 (2018)). Only when there are no such decisions may the court look to "a consensus of cases of persuasive authority from other jurisdictions, if such exists." Id. (quoting Owens, 372 F.3d at 280) (internal quotation marks omitted).

The first two steps in this analysis present pure questions of law. Collinson, 895 F.2d at 998. The third step "may sometimes require factual determinations respecting a defendant's conduct and its circumstances," but the ultimate application of the objective analysis in the third step "is also a matter of law for the court." Id.; see Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005) ("[W]e hold that the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury.").

The third step's reasonableness inquiry "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it

was taken.'" <u>Pearson</u>, 555 U.S. at 244 (2009) (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999)). The operation of the reasonableness inquiry "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." <u>Anderson</u>, 483 U.S. at 639. The Supreme Court has instructed that the right an official is alleged to have violated must have been "clearly established" in a more particularized sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> at 640. The Court quickly clarified, stating, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Id.</u> (internal citation omitted).

Therefore, even when a plaintiff proves that an official has violated his rights, the official may nevertheless be entitled to qualified immunity "if a reasonable person in the 'official's position could have failed to appreciate that his conduct would violate' those rights." <u>Torchinsky v. Siwinski</u>, 942 F.2d 257, 261 (4th Cir. 1991) (quoting <u>Collinson</u>, 895 F.2d at 998). This allowance for mistakes is "ample"—the qualified immunity standard protects "all but the plainly incompetent or those who knowingly violate the law." <u>Id.</u> at 229 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 341 (1986) (internal quotation marks omitted)). This allowance "exists because 'officials should not err always on the side of caution' because they fear being sued." <u>Id.</u> (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 196 (1984)). "If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." <u>Torchinsky</u>, 942 F.2d at 261.

The Court will grant summary judgment on all of Poole's claims except his First Amendment retaliation and Free Exercise claims and his RLUIPA claim. Therefore, those are the only claims which the Court will analyze for qualified immunity.

### i.     First Amendment Retaliation

Defendants cannot avail themselves of a defense of qualified immunity on Poole's First Amendment retaliation claim in light of the well-established law at the time the challenged conduct took place. First, as discussed above, Poole has marshaled facts that make out a violation of a constitutional right. In his Complaint, Poole alleges Defendants changed his cell in retaliation for filing of ARP 1682-16 and for contacting Andrew Dicks' attorney. (Compl. at 5). In his Supplement, Poole alleges Defendants violated his "First Amendment rights to redress by retaliating against [Poole] for being the legal wasir/ jailhouse lawyer assisting inmates who do not know how to properly fill out forms or the procedures associated with the grievance process." (Suppl. at 9). While plaintiffs may not have an independent right to serve as a "jailhouse lawyer," see McCoy v. Stouffer, No. CIV.A. WDQ-10-1583, 2013 WL 4451079, at *18 (D.Md. Aug. 15, 2013) (citing Thaddeaus–X v. Blatter, 175 F.3d 378 (6th Cir. 1999)), he does have the First Amendment right to be free from retaliation for filing an ARP per prison procedures, Booker, 855 F.3d at 545.

Turning to the second prong of the test, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker, 855 F.3d at 545; see also Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013) (finding that filing a prison grievance alleging excessive force is protected by the First

Amendment); Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010) (same). Further, this right to file ARPs free from retaliation was clearly established as of October 2016, when the alleged retaliation took place in this case. See Booker, 855 F.3d at 536, 545 (holding that the right to be free from retaliation for filing a grievance pursuant to an existing prison grievance procedure was clearly established, based on the consensus of other circuit courts, as of the time of alleged retaliatory activity in 2012). A reasonable officer should have known that he could not move an inmate to more restrictive housing for filing ARPs or helping other inmates with their conditions-of-confinement litigation. As a result, the Court concludes NBCI Defendants are not entitled to qualified immunity at this stage and that Warden Bishop, Chief Bohrer, Lt. Sawyers, Lt. Speir, Sgt. Forney, and Ofc. Tart are not entitled to summary judgment on this claim.

### ii.     Free Exercise and RLUIPA

As noted above, Poole has stated a violation of his First Amendment rights to religious practice in alleging, without rebuttal from Defendants, that he has been denied access to Jumu'ah services for nine months. Turning to the second prong of the test, a prisoner "retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell, 417 U.S. at 822. In the Free Exercise context, prisoners retain the right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. See Cruz, 405 U.S. at 322. The Fourth Circuit has held the First Amendment's Free Exercise Clause "forbids the adoption of laws designed to suppress religious beliefs or practices." Wall v. Wade, 741 F.3d 492, 498 (4th Cir. 2014) (quoting Morrison v.

Garraghty, 239 F.3d 648, 656 (4th Cir. 2001)). "This encompasses policies that impose a substantial burden on a prisoner's right to practice his religion." Id. (citing Lovelace, 472 F.3d at 198 & n.8). The Seventh Circuit has held "[p]rison administrators must permit inmates the reasonable opportunity to exercise religious freedom." Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988) (first citing Cruz, 405 U.S. at 322 n.2; and then citing Caldwell v. Miller, 790 F.2d 589, 596 (7th Cir. 1986)). In Lane, the prison administration's "denial of the inmates' opportunities for regular communal worship, religious instruction, and private religious counseling did not bear an adequate relationship to legitimate penological interests" and violated the Free Exercise Clause. 851 F.2d at 878. Further, with respect to RLUIPA, with the Supreme Court's 2005 decision in Cutter, "the law was clearly established that prison officials may not substantially burden an inmate's right to exercise personal religious beliefs without some compelling penological justification." Terrell v. Montalbano, No. 7:07-CV-00518, 2008 WL 4679540, at *5 (W.D.Va. Oct. 21, 2008); see also O'Lone, 482 U.S. at 352–53 (state prison regulations precluding Muslim inmates from attending weekly religious service did not violate First Amendment Free Exercise Clause where regulations were reasonably related to legitimate rehabilitative and security concerns of prison).

Based on the Supreme Court's decisions in Pell, Cruz, and Cutter, which were reiterated by the Fourth Circuit in Wall, the Court concludes that, if proven, preventing Poole from attending Jumu'ah services for nine months without substantiating any gang connection or other legitimate security reason to keep him away from other congregants violated clearly established law. A reasonable prison official would know that preventing

a prisoner, based on an unspecified security threat, from engaging in the scheduled religious services at the institution would violate his constitutional rights.

As a result, the Court concludes Defendants are not entitled to qualified immunity with respect to Poole's Jumu'ah-related claim under the First Amendment or RLUIPA. For the same reasons, and based on <u>Lovelace</u> and <u>McGinnis</u>, the Court also concludes Defendants are not entitled to qualified immunity with respect to Poole's Ramadan diet claims.

As a result, the Court concludes that Warden Bishop, Asst. Warden Nines, Chief Bohrer, Lt. Sawyers, Sgt. Forney, Chaplain Lamp, Lt. Haggard, Lt. Wiley, and Manager Kammauf are not entitled to qualified immunity at this stage and not entitled to summary judgment on Poole's Free Exercise and RLUIPA claims.

**C.     Poole's Motion for Reconsideration for Appointment of Counsel**

Finally, Poole requests the Court to reconsider appointing him counsel in this case. A "pro se prisoner does not have a general right to counsel in a [42 U.S.C.] § 1983 action." <u>Evans v. Kuplinski</u>, 713 F.App'x 167, 170 (4th Cir. 2017). A district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) (2018) is discretionary, and an indigent claimant must present "exceptional circumstances" to merit such an appointment. <u>Kuplinski</u>, 713 F.App'x at 170; <u>Miller v. Simmons</u>, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." <u>See</u> <u>Whisenant v. Yuam</u>, 739 F.2d 160, 163 (4th Cir. 1984), <u>abrogated on other grounds by</u> <u>Mallard v. U.S. Dist. Ct</u>., 490 U.S. 296, 298 (1989) (holding that § 1915 does not require appointment of counsel).

Here, Poole has established a genuine dispute of material fact as to his First Amendment and RLUIPA claims against Defendants. As a result, he has a colorable claim, yet as a non-lawyer prisoner, lacks the capacity to present it by himself at trial. Poole has therefore shown "exceptional circumstances" to merit the appointment of counsel in this case. As a result, the Court will grant his Motion with respect to his request for counsel.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part NBCI Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 36), construed as a motion for summary judgment. The Court will grant in part and deny in part Poole's Motion for Temporary Restraining Order, Reconsideration for Appoint of Counsel and Order Granting the Plaintiff's Request and Additional Exhibit(s) (ECF No. 38). The Court will grant Medical Defendants' Motion to Strike (ECF No. 39). A separate Order follows.


    9/30/19                                          /s/
Date                                          George L. Russell, III
                                              United States District Judge